IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:22-cr-026-002-REP |
| | ) | |
| v. | ) | |
| | ) | |
| LINDSEY EPPS PASSMORE, | ) | |
| | ) | |
| Defendant. | ) | |

**STATEMENT OF FACTS**

The parties stipulate that the allegations contained in Count One of the Indictment and the following facts are true and correct, and that had this matter gone to trial, the United States would have proven each of them beyond a reasonable doubt:

### I.  Introductory Background

1. Beginning before at least September 2, 2015, and continuing through on or about at least December 5, 2017, the exact dates being unknown to the Grand Jury, in the Eastern District of Virginia and within the jurisdiction of this Court, as well as elsewhere, defendant LINDSEY EPPS PASSMORE did unlawfully and knowingly conspire with Joshua Brian Romano to commit offenses contained within Chapter 63 of Title 18 of the United States Code, that is: to knowingly execute and attempt to execute a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, transmitting and causing transmission of writings, signs, and signals in interstate and foreign commerce, in violation of Title 18, United States Code, Section 1343.

1

2. Romano owned and operated various businesses that purchased, rehabilitated, and sold residential properties in the Richmond, Virginia metropolitan area. Those businesses included CNJ Ventures, LLC, Cobblestone Development Group, and Falling Water Construction and Design, LLC.

3. PASSMORE was employed as a paralegal by Law Firm A, a solo practice run by Attorney A. Law Firm A specialized in real estate law, most particularly representation of parties in real estate closings and other transactions.

4. Law Firm A maintained real estate trust accounts for use in real estate transactions. Funds deposited in those real estate trust accounts were held in trust or escrow and could be disbursed only for transaction-specific purposes and with the consent of the client who deposited the funds with Law Firm A. Funds deposited into Law Firm A's real estate trust account belonged to the client who deposited those funds until the funds were disbursed in accordance with the client's directions. PASSMORE's duties included the disbursement of funds from Law Firm A's real estate trust accounts.

5. One of Law Firm A's real estate trust accounts was account number xxxxx9976 with Park Sterling Bank. PASSMORE was authorized to transact business for Law Firm A using that account.

6. Lender A was a private "hard money" lender that lent funds to Romano (acting through CNJ Ventures and other entities) for use in the purchase and rehabilitation of residential properties. These "hard money" loans were generally made for shorter terms and at much higher interest rates than conventional commercial loans. Lender A and Romano contemplated that Romano would repay the principal balance on the loans from the profit on the sale of the residential properties.

7. Acting as both borrower (as owner of CNJ Ventures or Cobblestone) and guarantor (in his personal capacity) of the "hard money" loans, Romano executed Commercial Loan Affidavits identifying the property to be developed by the property's address. These affidavits also provided that "[t]he purpose of the loan secured by a first deed of trust on the [property described in the affidavit], is business or commercial, and not for personal, household, or family purposes. Specifically, the purpose is to purchase and/or rehabilitate investment real estate."

8. As a general rule, the "hard money" loans were also governed by Construction Loan Escrow Agreements or similar agreements. In all instances, though, the funds loaned ("the escrowed funds") were held in Law Firm A's real estate trust account and could be disbursed to Romano only for specific purposes related to the purchase and rehabilitation of the specific properties in question. In all instances, Romano was also required to notify Lender A of the amount sought and the purpose of the disbursement. Lender A then had to authorize the disbursement (also referred to as a "draw").

9. Law Firm A represented Lender A and Romano with respect to the loans referenced above. In addition to drafting escrow agreements and other documents, Attorney A held funds lent to Romano in escrow accounts, including Park Sterling account number xxxxx9976, pending disbursement in accordance with the directives of the relevant escrow agreements or Lender A's instructions. PASSMORE was generally responsible for the disbursement of Lender A's escrowed funds to Romano.

## II. The Conspiracy and Scheme to Defraud

10. The purpose of the scheme and artifice to defraud was for Romano, aided and abetted by PASSMORE, to: (a) unlawfully enrich himself though embezzlement of Lender A's

3

funds held in escrow by Law Firm A; and (b) conceal the embezzlement from Lender A and Attorney A, thereby avoiding further inquiries about the status of the embezzled funds and requests for repayment, as well as increasing the likelihood that Lender A and other lenders would make additional loans to Romano.

11. The manner and means of the scheme and artifice to defraud included, but were not limited to, the following:

    a. Acting at Romano's direction, and without the knowledge or authorization of Lender A or Attorney A, PASSMORE wired escrowed funds to be applied by Romano toward various purposes not authorized by Lender A.

    b. Upon receiving the escrowed funds, Romano did not spend the funds on materials or services related to the construction projects for which those funds had been specifically escrowed.

    c. Rather, Romano used the funds to cover expenses for other unrelated construction projects, expenses associated with the sale of unrelated properties, business operating expenses, and personal expenses.

    d. At times, Romano arranged the purchase of properties for the purpose of using funds escrowed for those purchases to fund other non-authorized work.

    e. To conceal the embezzlement, PASSMORE sent Lender A emails with false escrow balances as to the relevant loans.

    f. Romano falsely claimed at various times that Attorney A and PASSMORE had embezzled the escrowed funds themselves without Romano's knowledge.

12. Romano and PASSMORE embezzled funds that Lender A had deposited into Law Firm A's real estate trust account number xxxxx9976 with Park Sterling Bank in connection with CNJ Ventures' purchase and rehabilitation of the following properties:

    a. 2000 Prince George Road, Richmond, Virginia

    b. 2520 Stratford Road, Richmond, Virginia

    c. 3414 West Franklin Street, Richmond, Virginia

    d. 4110 Grove Avenue, Richmond, Virginia

    e. 2624 Idlewood Avenue, Richmond, Virginia

    f. 701 North 35th Street, Richmond, Virginia

13. On March 20, 2017, Lender A deposited the sum of $223,100 into Park Sterling account number xxxxx9976 to be held in escrow and released only for expenses associated with construction materials and work on 2624 Idlewood. PASSMORE, acting at Romano's direction, engaged in the following transactions utilizing the funds held in escrow for the Idlewood project:

    a. On March 21, 2017, PASSMORE sent an email to Lender A stating that "we need to request a draw from Idlewood in the amount of $71,565.03." The same day Lender A responded to the email (with Romano copied), "Linsey Please assist Thank you."

    b. Later on March 21, 2017, PASSMORE ordered the wiring of $71,565.03 of the funds escrowed for the Idlewood project to Law Firm B, which was handling the closing on Romano's sale of 11340 Buckhead Terrace, Midlothian, Virginia. Romano had to apply the $71,565.03 to various outstanding expenses at closing in order to complete the sale of the Buckhead Terrace property.

c. On April 28, 2017, PASSMORE ordered the wiring of $12,239.61 of funds escrowed for the Idlewood project to Law Firm C, which was handling the closing on Romano's sale of 11 Overbrook Road, Richmond, Virginia. Romano had to apply the $12,239.61 to various outstanding expenses at closing in order to complete the sale of the Overbrook Road property.

d. On June 5, 2017, PASSMORE ordered the wiring of a $9,975 disbursement from the funds escrowed for the Idlewood project to Falling Water's operating account, after which Romano applied the funds to expenses unrelated to the Idlewood project.

e. On June 15, 2017, PASSMORE ordered the wiring of a $33,975 disbursement from the funds escrowed for the Idlewood project to Falling Water's operating account, after which Romano applied the funds to expenses unrelated to the Idlewood project.

14. Lender A eventually became concerned about the disposition of the escrowed funds and inquired with PASSMORE as to the escrow balances for each property. In response, PASSMORE sent Lender A emails that falsely reported the balances held in escrow for these properties.

15. For instance, on December 5, 2017, PASSMORE sent Lender A an email falsely reporting the escrow account balances as to the following properties:

| Property | Reported Escrow Balance | Actual Escrow Balance |
|---|---|---|
| 2000 Prince George Road | $243,000 | $100 |
| 2520 Stratford Road | $194,040 | $140 |
| 3414 West Franklin Street | $151,004.62 | $222.17 |

6

| Property | Reported Escrow Balance | Actual Escrow Balance |
|---|---|---|
| 4110 Grove Avenue | $187,657 | $88.87 |
| 2624 Idlewood Avenue | $56,264.61 | $125 |
| 701 North 35th Street | $168,612.01 | $0 |

16. PASSMORE knew that the reported escrow balances set forth in paragraph 15 were false, because, acting at Romano's direction, she had affected the transactions that led to the depletion of those balances.

17. The emails and wirings described above were all initiated from within the Eastern District of Virginia and were routed outside of the Commonwealth of Virginia.

### III. Passmore's Knowledge and Intent to Defraud

18. Attorney A would have testified that:

    a. PASSMORE was an experienced paralegal who was familiar with the construction loan agreements and escrow terms. PASSMORE knew that a written draw request for escrowed funds was required and that the lender had to authorize the work and approve the draw in writing before PASSMORE could disburse the funds.

    b. PASSMORE was responsible for the disbursement of funds held in escrow pursuant to the agreements between Lender A and Romano.

    c. PASSMORE knew Romano socially and did part-time accounting work for Romano.

19. The shortfalls in Lender A's escrow balances for the transactions with Romano were brought to Attorney A's attention in December 2017 by both Lender A and Romano, who was feigning a lack of understanding about how the shortfalls could have occurred. Attorney A then discovered the embezzlement after conducting her own review of records.

20.     In late December 2017, Attorney A confronted PASSMORE about the embezzlement. During this confrontation, PASSMORE simply hung her head and said nothing in response. During a later conversation with Attorney A, PASSMORE stated that she thought that Romano would pay back the funds.

21.     On May 27, 2021, agents from the Federal Bureau of Investigation interviewed PASSMORE at her home about her employment with Law Firm A and involvement with the conspiracy. During the interview, PASSMORE related that funds escrowed for construction projects should have generally been disbursed only after authorization from lenders for specific work. The agents then asked PASSMORE whether that process was followed with the funds held in escrow for Lender A's loans to Romano. PASSMORE did not answer the question directly. Instead, she stated that she wanted to cooperate, but felt that she should talk to an attorney first. She added that she knew Romano (whom she described as a "narcissist") had gotten her into a lot of trouble and had taken advantage of her.

## IV.     Conclusion

22.     PASSMORE assisted Romano with the embezzlement of $1,206,953.27 in funds Law Firm A held in escrow for Lender A to Romano.

23.     PASSMORE did not receive any of the embezzled funds, nor did she receive any other compensation from Romano for assisting him. PASSMORE assisted Romano with the embezzlement of funds because she felt sorry for Romano, and, for a time, believed that he would ultimately be able to repay the stolen monies.

24.     The actions taken by the defendant as described above were taken willfully, knowingly, and with the specific intent to violate the law. The defendant did not take those actions by accident, mistake, or with the belief that they did not violate the law.

25. This statement of facts is intended to provide an independent factual basis to support the defendant's guilty plea. It does not necessarily contain a complete recitation of all illegal conduct in which the defendant engaged or about which she has knowledge.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____
Michael C. Moore
Assistant United States Attorney

After consulting with my attorney and pursuant to the plea agreement entered into this day between myself and the United States, I stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Lindsey Epps Passmore
Defendant

I am Lindsey Epps Passmore's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
Gregory R. Sheldon, Esquire
Counsel for Defendant